# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

JACQUELINE E. PRESI,      )
                             )
         Plaintiff,      )
                             )
v.                          )      Case No. 4:16CV01857JCH
                             )
ASCENSION HEALTH ALIANCE, et al.      )
                             )
         Defendants.      )

## MEMORANDUM AND ORDER

This matter is before the court on Defendants Ascension Health Alliance ("Ascension"), Ascension Long Term Disability Plan ("LTD Plan"), Ascension Short-Term Disability Plan ("STD Plan"), and Sedgwick Claims Management Services, Inc.'s ("Sedgwick")(collectively "Defendants") Motion for Summary Judgement filed November 6, 2018. (ECF No. 55). This matter is also before the Court on Plaintiff Jacqueline E. Presi's Motion for Judgement on the Administrative Record or in the Alternative Motion for Summary Judgement, filed November 6, 2018. (ECF No. 58). The Court will take up both motions together. The motions are fully briefed and ready for disposition.

## BACKGROUND[1]

Plaintiff was employed by Alexian Brother's Health System ("Alexian") as a Unit Secretary, which required clerical duties, reception functions, training new unit secretaries and other staff, and ensuring that the department operated effectively. (Defendants' Statement of Uncontroverted Material Facts ("Defendant Facts") ¶ 22; *and see,* Plaintiff's Statement of Uncontroverted Material Facts ("Plaintiff Facts") ¶ 5). At all times relevant hereto, Plaintiff was

---

[1] Citation is primarily to the Defendants' Statement of Uncontroverted Facts or the Administrative Record itself. Defendant's statement of facts provided a more complete record and was primarily uncontested by the Plaintiff.

an employee of Alexian.[2] (Plaintiff Facts ¶ 4). Alexian by written agreement adopted a welfare benefit plan through Acension, which offered short-term disability benefits ("STD benefits") and long-term disability benefits ("LTD benefits") for the benefit of some or all of its employees including the Plaintiff. (Plaintiff Facts ¶¶ 1, 8). Ascension delegated the discretionary authority to make claims determinations to Sedgwick, the Claims Administrator. As such, Sedgwick possessed discretionary authority to make benefit determinations. (Defendant Facts ¶¶ 14-15, citing AR AH1226, AR AH1288).

Plaintiff filed the present lawsuit on November 22, 2016, seeking STD benefits pursuant to the STD Plan. (ECF No. 55 ¶1). Plaintiff amended her claim on May 7, 2018, to include a claim for LTD benefits pursuant to the LTD Plan.[3] *Id.*

### I. Plaintiff's STD claim

Plaintiff first missed work due to her alleged Disability on or about May 20, 2015.[4] (Defendant Facts ¶ 23). Plaintiff alleges that she has a history with osteochondroma (benign tumors of the bones), muscle spasm, shoulder pain, and anxiety disorder, and had some osteochondroma surgically removed from her shoulder in May of 2012.[5] (Defendant Facts ¶ 23, citing AR AH0205). Plaintiff submitted a claim for STD benefits at which time Sedgwick requested medical documentation to evaluate her claim. (Defendant Facts ¶ 24, citing AR

---

[2] Plaintiff states in her facts that the Plaintiff was an employee of Alexian and/or Ascension. (Plaintiff Facts ¶ 4). The Defendants state that Alexian constituted the Plaintiff's employer as defined in 29 U.S.C. § 1002(5) and (6); and denies that Plaintiff was ever employed by Ascension.
[3] Both the STD Plan and the LTD plan are employee welfare plans governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001 *et seq.* ("ERISA").
[4] Plaintiff states that she last worked in late April or May of 2015. (Plaintiff Facts ¶ 5).
[5] Plaintiff asserts that the primary medical conditions that form the basis of her claim are "multi-factorial and include without limitation the following: complex hereditary osteochondroma, snapping scapula syndrome, osteopenia, muscle spasms and weakness, along with chronic associated pain and migraines. Plaintiff also has two bulging disks in her neck (cervical spine). She also suffers with significant problems with her right hand which is her dominant hand. Given her problems, injections to her body parts have been required. She also has problems with her vision" (Plaintiff Facts ¶ 13). Defendant objected to Plaintiff's support for these facts in the Administrative Record and alleges that the Plaintiff impermissibly relies on a summary provided by counsel rather than the medical records included in the Administrative Record. (ECF No. 62 at 7).

AH0156-165). The STD Plan requires that Plaintiff submit proof, in the form of objective medical evidence to substantiate the existence of Plaintiff's alleged Disability. (Defendant Facts ¶¶ 9-10, citing AR AH0074).

The STD Plan defines "disability" and "disabled" for the purposes of STD benefits as follows:

> [D]ue to an Injury or Sickness which is supported by *objective medical evidence* (a) the Participant requires and is receiving from a Licensed Physician regular, ongoing, medical care and is following the course of treatment recommended by the Licensed Physician; and (b) either (1) or (2) below is satisfied. (1) the Participant is unable to perform each of the Material Duties[6] of the Participant's Regular Occupation;[7] or (2) while unable to perform each of the Material Duties of the Participant's Regular Occupation on a full-time basis and while eligible for Rehabilitative Employment, (A) the Participant is performing at least one of the Material Duties of Regular Occupation or any other work or service on the part-time or full time basis; and (B) the Participant's earning from work while Disabled does not exceed 80% of the Participant's Basic Weekly Earnings.

(Defendant Facts ¶ 6).

### a. Plaintiff's Initial STD Claim

In September of 2014, the Plaintiff visited the emergency room due to severe headache with facial numbness, and a CT scan was performed. The CT scan was normal and the Plaintiff was discharged the next day. (Defendant Facts ¶29, citing AR AH0189-93). The records state that Plaintiff had "complete near resolution of her migraine, was able to tolerate her meal, ambulate, and tolerate light noise without difficulty. Patient was then released from the hospital discharged home." (AR AH0189). On December 12, 2014, Plaintiff visited Dr. Danielle

---

[6] Material duties are defined as the "essential tasks, functions and operations, and the skills abilities, knowledge, training, and experience generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted." (Defendant Facts ¶7).

[7] Regular Occupation is defined as the "activities that the Participant regularly performed when the Participant's Disability began. In addition to the specific position or job the Participant holds with the Participant's employer, Regular Occupation also includes other positions and jobs for which the Participant has training and/or education to perform in the Participant's profession at the Participant's Employer or another employer. If the Participant's Regular Occupation involves rendering of professional services and the Participant is required to have a professional or occupational license to work, the Participant's Regular Occupation is as broad as the scope of his or her license." (Defendant Facts ¶ 8).

Anderson[8] for a follow-up after her hospital visit to discuss persistent facial pain. Dr. Anderson

prescribed Tegretol RX tabs (seizure control medicine), and instructed the Plaintiff to continue

her other medications including Lyrica (pain medication to treat pain caused by nerve damage),

Norco (pain medication), and Mortin (pain medication). (Defendant Facts ¶ 30, citing AR

AH0197-99).[9] Dr. Anderson in her record states:

> The patient tells me that it onsent of the left maxillary region
> shooting/stabbing pains May 2014 at the time she was diagnosed with a
> sinus infection treated by an ENT, Dr. Dreitch with antibiotics. This did
> resolve the pain temporarily, but pain resumed, she describes the pain as
> lightning bolts in nature, 8/10 severity at times, occurring on a daily basis,
> episodically, throughout the day but still severe to this date. She has seen
> Dr. Rosenblatt, neurosurgery and diagnosed her with a left-sided atypical
> facial pain and instructed her to come here for medical treatment….she
> denied any weakness of face or extremities.

(AR AH0197). Dr. Anderson additionally determined that the Plaintiff had, "no drift or

asymmetry in the upper or lower extremities; strength symmetrical and full in all four

extremities…range of motion at the left shoulder joint is normal." (AR AH0198).

On December 30, 2014, Plaintiff visited Dr. Anderson again and stated that the new

medication provided good relief for her facial pain. (Defendant Facts ¶ 31, citing AR AH0194-

96). The record goes on to state that the Plaintiff experiences some "break through pain" and that

the "Patient does have some dizziness and lightheadedness on her current medication regimen

but is slowly getting used to it. She denies any new focal neurological deficits." (AR AH0194).

On May 20, 2015, and on June 3, 2015, the Plaintiff visited Dr. Sood for

complaints of shoulder pain and for assistance completing paperwork for disability and

FMLA leave. (Defendant Facts ¶ 34, citing AR AH0210-15). Dr. Sood noted that on May

20, 2015, the Plaintiff complaint included pain management. Dr. Sood stated that,

---

[8] Northwest Neurology
[9] Plaintiff disputes the date of her appointment with Dr. Anderson and claims that the appointment took place on December 18, 2014. (ECF No. 64).

Patient uses strong opiate pain medications and muscle relaxant to control her pain and muscle tightness. The side effects impair her ability to perform her work in a safe and effective manner. The over use of her shoulder and arms with repetitive movement can exacerbate her condition and is presenting today for further evaluation.

(AR AH0213).

Sedgwick also received records from Dr. Sanjay Patari's[10] office which reflected that on June 10, 2015, the Plaintiff complained of pain in her left scapula. (Defendant Facts ¶ 25, citing AR AH0184-88). Plaintiff received six series of corticosteroid injections from one of her other treating physicians, Dr. Rajiv Sood. *Id.* Dr. Patari's physical examination indicated some crepitus (grating, crackling or popping sounds) in Plaintiff's shoulder and "some atrophy of the surrounding fat musculature." (AR AH0167). Dr. Patari recommended that the Plaintiff receive corticosteroid between the scapula and the ribs as well as physical therapy to improve her strength. *Id.*

On July 13, 2015, Sedgwick spoke with the Plaintiff who explained her medical history with osteochondromas and noted prior medical issues including glaucoma and migraines. The Plaintiff further stated that although she was unable to vacuum, lift or clean, she could do lots of things with her left arm and could write with both hands. (Defendant Facts ¶ 31, citing AR AH0201-03). On July 20, 2015, Dr. Sood completed an Attending Physician Statement, in which he made an objective finding of osteochondroma and subjective systems of pain, muscle spasms, increased anxiety and weakness. (Defendant Facts ¶ 33, citing AR AH0205). Dr. Sood noted that the Plaintiff was ambulatory but also noted his belief that the Plaintiff could not return to her regular occupation without restrictions or without restricted light duty. (Defendant Facts ¶ 33, citing AR AH0205). In his Attending Physician Statement, Dr. Sood marked that on May 20, 2015, he advised the Plaintiff to discontinue her job duties. *Id.*

---

[10] The Center for Sports Orthopedics, S.C.

Nurse Case Manager Jennifer Jansen RN,[11] reviewed the medical documentation and found Dr. Sood's examination to be normal with no indication of limited range of motion or decreased strength resulting from Plaintiff's complaints of pain. (Defendant Facts ¶ 33, citing AR AH1188-89). Nurse Jansen further found that there was no swelling or muscle spasms, and no increase in medications over the last three appointments with Dr. Sood. The Plaintiff had only received refills on her medication. Nurse Jansen also reviewed the diagnostic imaging contained in the Plaintiff's claim file and determined that all of the tests were unremarkable and within normal limits or unchanged from previous imaging. Based on her review, Nurse Jansen recommended that STD benefits be denied. *Id.*

On July 31, 2015, the Plaintiff was notified by letter that her claim for STD benefits had been denied. (Defendant Facts ¶ 36, citing AR AH0230-31). In its denial letter, Sedgwick explained that its decision to deny Plaintiff's claim was based on the physical examinations of Dr. Sood between May and July of 2015, which appeared normal and did not indicate a limited range of motion or decreased strength, swelling or spasm and because the Plaintiff did not receive any dosage increases on her medications. Sedgwick looked at the MRI, EKG and CT scans provided, all of which were in normal ranges, unremarkable or did not show a change from prior imaging. (Defendant Facts ¶ 37). Sedgwick also relied upon a record from Dr. Patari, from June 10, 2015 which reflected that a recent CT scan showed no obvious impingement or recurrence of osteochondroma of Plaintiff's scapula. *Id.*, citing AR AH0230-31. The letter also advised the Plaintiff of her right to appeal. *Id.*

b. **Plaintiff's Appeal of Her STD Claim**

---

[11] Plaintiff specifically takes issue with the review of Plaintiff's medical records by an on-staff RN employed by Sedgwick and that she is not an MD, NP, or PA. (ECF No. 64 at 16).

On August 6, 2015, the Plaintiff requested a copy of her claims file which was provided to her on August 25, 2015. (Defendant Facts ¶ 38). On January 26, 2016, the Plaintiff appealed the initial denial of her STD benefits and submitted her medical records, biographical information, and curriculum vitae documentation for her providers. (Defendant Facts ¶¶ 39-40, citing AR AH0454-064). Additional documentation included records from Dr. Sood and Dr. Chintalben Shah for visits in 2012 and 2013 for shoulder pain and steroid injections. (Defendant Facts ¶ 41, citing AR AH0539-553). On April 12, 2015, Dr. Sood recommended that Plaintiff undergo a functional capacity evaluation to which the Plaintiff declined.[12] (Defendant Facts ¶ 43, citing AR AH0531-33). On August 12, 2015, Plaintiff visited Dr. Sood again to review FMLA papers and was physically examined. The examination was normal except for bilateral shoulder popping in Plaintiff's upper extremities and facial pain. (Defendant Facts ¶ 44, citing AR AH0520-21). Dr. Sood notes that "[p]atient has had multiple growths on her shoulder that keep growing back." (AR AH0521).

On August 21, 2015, the Plaintiff saw Melissa Swierad, APN for continued headaches and shoulder pain; and to complete paperwork for time off of work. At this appointment Ms. Swierad physically examined the Plaintiff and noted normal findings except for shoulder pain and popping. (Defendant Facts ¶ 45, citing AR AH0514-16). On September, 9, 2015, the Plaintiff went back to Dr. Sood and sought further evaluation. Dr. Sood's report stated that the Plaintiff is "severely impaired, can't live with the pain but can't live with the side effects caused by the pain medications. It was recommended that Plaintiff to follow up with her rheumatologist and pain specialist for chronic pain." (Defendant Facts ¶ 46, citing AR AH0514-16).

---

[12] In a medical note from Dr. Sood dated June 10, 2015 Dr. Sood notes that the Plaintiff was instructed to have a Functional Capacity Evaluation done but that the Plaintiff was unable to go for this due to lack of insurance coverage and inability to financially afford it. (AR AH0532).

A letter from Dr. Bigol dated January 22, 2016, indicated that on December 10, 2015, the Plaintiff came in for persistent left scapular pain, radiating to the left shoulder and neck region. (AR AH0494). The letter contains a review of Plaintiff's conditions. Dr. Bigol had been treating the Plaintiff for osteochondroma of the left scapula which was resected in May of 2012. Dr. Bigol's letter explains that the Plaintiff experienced a complication of "reversible mild brachial plexus traction injury, manifested by left shoulder numbness and tingling…[and] snapping scapula which worsened and persisted after the procedure." Dr. Bigol states that:

> She continued to be symptomatic of left periscapular pain, which was described as sharp and radiating to the left shoulder and left neck areas. It is also accompanied with constant tingling and numbness, and with the sensation of muscular fatigue and upper extremity instability. This is more apparent during repetitive movement. It results in her dropping things due to momentary loss of movement control, loss of strength and weakness. The pain is felt at all times even at rest and becomes worse with activities. She had undergone several steroid injections without success. Treatment modality such as local heat, topical over the counter medications and massage offered minimum relief. The only medication that helps are narcotics…[t]his has allowed her to perform the activities of daily living but has limitations due to side effects, such as drowsiness. Over time she required higher doses of medication with increasing side effects…this is not compatible for her to maintain livelihood.

(AR AH0494). Dr. Bigol also included his physical examination findings while the patient was on pain medication. Upon physical examination Plaintiff was deemed to have full range of motion of the left shoulder with pain and clicking or snapping sounds and experienced localized pain around the surroundings of left scapula. (Defendant Facts ¶ 51, citing AR AH0504; *and see,* AR AH0494). The documentation from Dr. Bigol also referenced an initial evaluation at Alexian Rehabilitation, at which time it was determined that the Plaintiff, not on pain medication during the evaluation, experienced decreased range of motion and pain upon movement. (AR AH0494; *but see,* Defendant Facts ¶ 51 citing, AR AH0504). These records state that medical and surgical treatments have not been successful and that the Plaintiff's "complicated osteochondroma is a

debilitating illness. It limits her control and ability to perform the lightest duties inclusive of her left upper extremity and movements requiring pivoting at the lumbar (abdomen or lower spine), thoracic (mid-spine) and cervical spine (neck) regions with associated pain" the Plaintiff "would have difficulty functioning with activities of daily living and will be unable to fulfill her professional duties at work" and her condition is likely to be permanent with the only viable treatment being pain control. (Defendant Facts ¶ 51, citing AR AH0504).

On December 15, 2015, the Plaintiff sought a second opinion from Dr. Gregory Drake regarding the pain in her left neck, shoulder and periscapular region. (Defendant Fact ¶ 47, citing AR AH0485-87). At that appointment the Plaintiff states that her,

> "[p]ain is severe with a rating of 10/10. She describes the symptoms as constant, sharp, stabbing, throbbing, aching, pressure and radiating. The symptoms worsen as the day progresses. The symptoms are worse in the evening. Additional symptoms include numbness, stiffness, tingling, weakness, swelling, instability, fatigue, ROM (range of motion) limitation, radiation of pain on the involved side, sleep disturbances and loss of feeling. Since the onset, the symptoms have been worsening. Symptoms are made worse with rest, activity, lifting and movement."

(AR AH0485).  Upon examination, Dr. Drake notes that, "[t]here is no deformity, swelling ecchymosis (bruising), or atrophy present," that Plaintiff's right and left neck were pain free with a full range of motion, but there was tenderness in the left bicipital groove but no swelling , ecchymosis or deformity. Dr. Drake goes does note that Plaintiff experiences pain with 160 degrees of right abduction and with 90 degrees of right external rotation. *Id.* Dr. Drake stated that there was no evidence of rotator cuff tear, nor was this a recurrence of the Plaintiff's osteochondroma. (Defendant Facts ¶ 47, citing AR AH0485-87). Dr. Drake recommended physical therapy and further recommended dry needling for periscapular pain. *Id.*

On January 5, 2016, the Plaintiff visited Dr. Matthew Jiminez with complaints of pain and popping in her shoulder and cervical spine. (Defendant Facts ¶ 48, citing AR AH0505-07).

Dr. Jiminez observed the popping on range of motion, but also observed a full range of motion. *Id.* Dr. Jiminez ordered x-rays which showed that the glunohumeral joint was well located and confirmed Plaintiff's diagnosis of multiple osteochondromatosis. *Id.* On January 12, 2016, Plaintiff described her pain as "involving mainly the L (left) periscapular region radiating to L (left) shoulder and neck area" which was "reduced by narcotics from 10/10 to tolerable intensity of 4-5/10…nothing helps her except medications." (AR AH0894). The Plaintiff then saw Dr. Jay Joshi on January 20, 2016, for left shoulder pain aggravated by weather. Dr. Joshi prescribed left thoracic medial beta block injections. (Defendant Facts ¶ 49, citing AR AH0499-500).

On February 10, 2016, Plaintiff saw Dr. Joshi for a post procedure follow up. Her diagnosis at this time was, unspecified thoracic, thoracolumbar, and lumbosacral intervertebral disc disorder; pain in the thoracic spine, intercostal neuropathy, other disorders of the peripheral nervous system, osteochondropathy, unspecified of unspecified site, hyperesthesia, neuropathic pain, intercostal neuralgia, and osteochondritis. (AR AH0899-900). Plaintiff reported that her pain was felt when using her left arm and that right scapula popping was extremely painful, she stated that actions such as bending backwards, exercise, lifting and any repetitive movement using the left arm aggravated her pain; and that she was experiencing a dizzy or high feeling from her Lyrica medication.[13] (AR AH0900-01).

A letter dated March 14, 2016, from Dr. Bigol provided a clinical status update stating that the Plaintiff was diagnosed with, Osteochonfromatosis left upper and lower extremities; thoracic spondylosis without myelopathy; and thoracolumbar intervertebral disk disease; that the "[p]atient continues to experience recurrent left scapular pains and also has developed right scapular pains since February 2016" that "[o]n February 4th, 2016, she received her first steroid

---

[13] Plaintiff also reported feeling a dizzy side effect from the Lyrica to Dr. Joshi on January 20, 2016. (AR AH0904-05).

injections over the left T4-T8 facet medial branch block under fluoroscopic guidance. Anesthesia mild sedation. She had great but temporary relief." (AR AH0897). "On March 31, 2016, she is scheduled to receive her second steroid injections over the T4-T8 level at Alexian Brother's Medical Center, she also has an appointment to see a rheumatologist on March 17, 2016." *Id.*

On April 21, 2016, Dr. Carol Hullet submitted her independent medical analysis of Plaintiff's claim of disability between the dates of April 17, 2015 through October 13, 2015. Dr. Hullet concludes that although the Plaintiff has multiple osteochondroma, "[t]here has not be a recurrence of the osteochondroma" nor any "significant complaint due to any other osteochondromas." (AR AH0941). Dr. Hullet goes on to say that, "[p]ain, however, is described as 10/10 and only partially relieved by pain medication. Other treatments have been largely unsuccessful" and concludes that, "there are no clinical findings indicating any functional limitation from any orthopedic condition" and then states that "there are no findings that are not clinically significant" when asked to explain why certain findings in the record are not clinically significant. (AR AH0942).

Also on April 21, 2016, Dr. Mahajan submitted his independent medical analysis of Plaintiff's disability claim and concludes that the Plaintiff was not disabled between April 17, 2015 and October 13, 2015. Dr, Mahajan states:

> The provided medical records do not include any clinical abnormalities to substantiate the need for work or activity restrictions. The claimant's examination findings by various physicians do not reveal any evidence of abnormalities consistent with an ongoing active process, such as malignant neoplasm. The need to assess a patient as being unable to perform usual and customary work-activities needs to be based on clinical examination or clinical abnormalities as opposed to self-reported complaints.

(AR AH0946). When asked what findings were not clinically significant, Dr. Mahajan states that "[f]rom a pain management perspective, the claimant is not disabled." *Id.*

On May 16, 2016, Dr. Hulett and Dr. Mahajan were asked to review Plaintiff's medical evidence with regard to the possible side effects she may have experienced from her prescribed medications. (AR AH0961) Dr. Hullet indicates that "there are no side effects other than drowsiness mentioned by her (Plaintiff's) internist. This side effect would not result in her inability to safely perform her own regular unrestricted job." (AH0968). In contrast, Dr. Mahajan states that "the medical records reviewed do not contain any indication that the claimant is experiencing side effects from her current medications." (AR AH0976). He continues stating that Dr. Sood and Ms. Swierad, ARNP document that "the claimant was taking strong opiate medications and muscle relaxants for pain and the side effects of medications impaired her (Plaintiff's) ability to perform her work in a safe and effective manner. While the medications can potentially have adverse effects, bi adverse effects were documented. There are no changes in mentation, muscle weakness or any other objective findings documented…[i]n this case, no findings related to the side effects from medication are documented. (AR AH0976).

On May 26, 2016, Sedgwick informed the Plaintiff that the denial of her STD benefits would be upheld on appeal. (Defendant Facts ¶¶ 68-69, citing AR AH0979-980). The letter advised Plaintiff that this decision was final and binging, and explainted that Plaintiff would be provided with reasonable access and copies to documents relevant to her claim, and that she had a right to bring an action under ERISA. (Defendant Fact ¶ 70, citing AR AH0979-0980).

## II.     Plaintiff's LTD Benefits Claim

In addition to its STD Plan, Ascension also sponsors a self-funded LTD Plan[14] for eligible employees of Alexian Brothers Health System. (Defendant Facts ¶ 11, citing AR AH1214, 1219). Ascension is the LTD Plan Sponsor and Plan Administrator and delegated its discretionary authority to make claims determinations to Sedgwick. (Defendant Facts ¶¶13-14, citing AR AH1226, AR AH1288). Under the terms of the LTD Plan a Disabled employee is required to complete an Elimination Period before benefits become payable. (Defendant Facts ¶ 16, citing AR AH 1240). The LTD Plan defines the Elimination Period as "'the number of consecutive calendar days of Disability before benefits become payable under the Plan…'" subject to conditions.[15] (Defendant Facts ¶ 17, citing AR AH1219). The LTD Plan Elimination Period is 180-days; therefore the LTD benefits begin on the 181th consecutive day of Disability. (Defendant Facts ¶¶19-20, citing AR AH1289, AR AH1291).

On or about September 28, 2016, the Plaintiff requested that Sedgwick open a claim for LTD benefits. (Defendant Facts ¶ 72, citing AR AH2671). Plaintiff maintains that prior to this date, on or about April 9, 2016, Plaintiff, or her husband acting or her behalf, sought to initiate an LTD claim on April 9, 2016. (ECF No. 64 at 31, citing AR AH1090-91). On November 4, 2016 the Plaintiff's claim for LTD benefits was denied because Sedgwick believed that the Plaintiff had failed to timely elect LTD coverage. (Defendant Facts ¶ 73, citing AR AH1298-99). On January 13, 2017, Plaintiff appealed the decision and provided documentation that the

---

[14] The LTD Plan is an employee welfare benefits plan governed by ERISA.
[15] The Elimination Period accrual is subject to the following conditions:

> "During the Elimination Period a Total Disability that temporarily ceases for not more than thirty (30) days, whether consecutive or intermittent, will be considered continuous for the purpose of accumulating the Elimination Period. Any days that the Participant is not disabled will not be counted toward the completion of the Elimination Period…If during the Elimination Period a Participant becomes eligible for coverage under any other group long-term disability plan/policy, the terms of the above… shall not apply."

(Defendant Facts ¶ 18,citing AR AH1240-41).

Plaintiff had elected LTD coverage. (Defendant Facts ¶ 74, citing AR AH1319-362). On February 7, 2017, Sedgwick informed the Plaintiff that the denial of her claim would be overturned. (Defendant Facts ¶ 75). To make a determination, Sedgwick requested medical evidence and completed LTD forms from Plaintiff's treating providers, Dr. Anderson, Dr. Bigol Dr. Drake, Dr. Jiminez, Dr. Patari and Dr. Sood. (Defendant Facts ¶ 76, citing AR AH1396-1429).

On March 14, 2017, Nurse Case Manager Jennifer Jansen reviewed Plaintiff's LTD claim file and recommended that the LTD claim be denied.[16] (Defendant Facts ¶ 84, citing AR AH2595-97). Nurse Jansen concluded that the information provided to her did not substantiate a finding of disability and that there were insufficient exam findings to show that Plaintiff was unable to perform her job demands. (Defendant Facts ¶ 85, citing AR AH2596-97). On March 15, 2017, Sedgwick denied Plaintiff's claim and apprised her of her appeal rights. (Defendant Facts ¶ 86). Plaintiff appealed on September 11, 2017, (Defendant Facts ¶ 88, citing AR AH2174-2360). In her appeal Plaintiff included additional medical records from her treating physicians. *Id.* Additionally on appeal, Plaintiff challenged the weight Sedgwick gave to the side effects that she claimed to be experiencing from her medications. (AR AH2163).

On January 24, 2018, Sedgwick held a round table to discuss the review of Plaintiff's appeal. (Defendant Facts ¶ 97). The round table was tasked with first determining if the Plaintiff was eligible for LTD benefits. If Plaintiff was determined to be eligible then Sedgwick intended to send Plaintiff's claim for rheumatology, orthopedic, and psychology independent medical reviews followed by a cumulative review. (Defendant Facts ¶ 97, citing AR AH2554). On January 30, 2018, Sedgwick determined that the Plaintiff was not eligible for LTD benefits

---

[16] Plaintiff takes specific issue with the review by Ms. Jansen because she is an on-staff RN employed by Sedgwick and is not an MD, NP or PA. Plaintiff however does not make a claim for conflict of interest.

because she had not been approved for STD benefits. (Defendant Facts ¶ 98). Approval for the maximum 180-day elimination period is required for LTD eligibility. (Defendant Facts ¶ 98, citing AR AH2551). Sedgwick remanded Plaintiff's claim for an eligibility review. *Id.*

On February 7, 2018, Plaintiff was informed of the denial of her LTD claim due to her failure to complete the elimination period. (Defendant Facts ¶ 99, citing AR AH2483-85). On March 13, 2018, Plaintiff appealed. (Defendant Facts ¶ 100, citing AR AH2494). The denial was upheld on March 19, 2018. (Defendant Facts ¶ 101, citing AR AH2506-07). On May 7, 2018, Plaintiff amended her present lawsuit to include a claim for LTD benefits.

## SUMMARY JUDGEMENT

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256. In passing on a motion for summary judgment, the Court

must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id.* at 249.

## <u>DISCUSSION</u>

The Eight Circuit has held that, "[u]nder ERISA, a plan participant may bring a civil action to 'recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" *Pralutsky v. Metropolitan Life Ins. Co.*, 435 F.3d 833, 837 (8th Cir. 2009), quoting 29 U.S.C. § 1132(a)(1)(B), *cert denied*, 549 U.S. 887 (2006). "[T]he district court reviews de novo a denial of benefits in an ERISA case, unless a plan administrator has discretionary power to construe uncertain terms or to make eligibility determinations, when review is for abuse of discretion." *Risttenhouse v. UnitedHealth Group Long Term Disability Ins. Plan*, 476 F.3d 626, 628 (8th Cir. 2007)(emphasis omitted)(citation omitted).

In the instant case, Plaintiff does not dispute that the Plan granted Sedgwick discretionary authority to determine eligibility for benefits and construe terms of the Plan, (ECF No. 59 at 4; ECF No. 64, 2-3,8). The standard of review for this Court thus is abuse of discretion.

> Under the abuse of discretion standard, the proper inquiry is whether the plan administrator's decision was reasonable; *i.e.*, supported by substantial evidence. In considering the reasonableness of a plan administrator's fact-based disability determination, courts should consider whether the decision is supported by substantial evidence. Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001) (internal quotation marks and citations omitted). In making its determination "a reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new

evidence or consider *post hoc* rationales." *King v. Hartford Life and Acc. Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (internal quotation marks and citation omitted). In light of this standard, the Court will not consider medical records attached to Plaintiff's claim for LTD benefits in evaluating Plaintiff's claim for STD benefits.

Finally, "[a] decision supported by a reasonable explanation will not be disturbed even if another reasonable interpretation could be made or if the court might have reached a different result had it decided the matter de novo." *Phillips-Foster v. UNUM Life Ins. Co. of America,* 302 F.3d 785, 794 (8th Cir. 2002)(citation omitted); *see also, Midgett v. Washington Group Intern, Long Term Disability Plan,* 561, F.3d 887, 897 (8th Cir. 2009)(emphasis in original)(internal quotation marks and citation omitted)("The requirement that the [plan administrator's] decision be reasonable should be read to mean that a decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision.").

I.      **Plaintiff's claim for STD benefits**.

In their Motion for Summary Judgement the Defendants argue that the Plaintiff is not entitled to the benefits that she seeks under the STD plan. (ECF No. 56 at 1). Defendant argues that the Plaintiff had the burden to and has failed to provide adequate "proof" or "objective medical evidence" required to be eligible for STD benefits. *Id.* at 2, 4. Defendant asserts that the Plaintiff did not submit medical records that contained clinical findings supporting functional limitations or work activity restrictions. *Id.* at 2. In response, the Plaintiff argues that the quality and quantity of Plaintiff's medical reports and documentation amount to proof of the Plaintiff's disability. (ECF No. 63, 3-4). Plaintiff asserts that Defendant Sedgwick's review denying STD benefits failed to consist of a full and fair review under ERISA because the decision was based

on the opinion of an on staff nurse case manager and doctors employed by Sedgwick who did not examine the Plaintiff. *Id.*, 5-6.[17] Plaintiff also contends that Sedgwick ignored the medical findings of the Plaintiff's treating physicians. *Id.*, at 8 (stating that Sedgwick has "improperly 'cherry-picked' the medical proof of Ms. Presi's disability").

On her Motion for Judgement on the Administrative Record or in the Alternative Motion for Summary Judgment, the Plaintiff argues that Plaintiff's STD claim should have been approved as evidenced by the documents submitted on behalf of the Plaintiff which evidence that she had disability. (ECF No. 59, 5-6). Additionally, Plaintiff argues that the Defendants' support for their denial was insufficient. *Id.* Plaintiff argues that Sedgwick could have had the Plaintiff examined by a physician of its choice to assess her physical condition but did not and therefore disregarded reliable medical information. *Id.* at 8. In response, the Defendants argue that reliance on the claims file and reports by peer-review physicians is reasonable. (ECF No. 61, 8-9). Defendants further argue that they were under no obligation to have the Plaintiff examined by the other physicians and that there "is no documented objective medical evidence to support that Plaintiff's diagnoses render [her] functionally incapable of working as a unit secretary. *Id.*, 10-11.

Plaintiff cites to Sixth Circuit cases, *Kalish v. Liberty Mutual/Liberty Life Assur. Co.,* [18] and *Niswonger v. PNC Bank Corp. & Affiliates Long Term Disability Plan,*[19] for the proposition

---

[17] Plaintiff does not clearly raise a conflict of interest issue in this case.

[18] *See, Kalish v. L Liberty Mutual/Liberty Life Assur. Co.*, 419 F.3d 501(6th Cir. 2005)(when plan administrator's explanation with some skepticism…Physicians repeatedly retained by benefits plans may have incentive to make a finding of "not disabled" in order to save their employers' money and preserve their own consulting arrangements…Whether a doctor has physically examined claimant is one factor that a court may consider in determining whether plan administrators acted arbitrarily and capriciously in giving greater weight to opinion of its consulting physician. The failure to conduct a physical examination may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination…).

[19] *See, Niswonger v. PNC Bank Corp. & Affiliates Long Term Disability Plan*, 612 Fed. Appx 317,323 (6th Cir. 2015)(holding that Liberty's denial of benefits was arbitrary and capricious because of its disregard of reliable

that the Court ought to view the independent medical examinations conducted by Sedgwick with skepticism. These cases however are not binding and run contrary to Eighth Circuit Precedent. The Eighth Circuit has found that there is no abuse of discretion in cases where an administrator could order an independent medical examination and declined to do so. *Rutledge v. Liberty Life Assur. Co. of Boston*, 481 F.3d 655, 661 (8th Cir. 2007). Therefore, defendant's decision to not have the Plaintiff examined independently does not amount to abuse of discretion. This Court is bound by the United States Court of Appeals for the Eighth Circuit ("Eighth Circuit") precedent and will not apply the law from another circuit where the Eighth Circuit has been clear. *See, Hood v. United States,* 342 F.3d 861,864 (8th Cir. 2003)(holding that a district court in the Eighth Circuit is bound to apply Eighth Circuit precedent); *see also, Hull v. Stevens Transp., Inc.*, 2015 WL 3454512 at *2 (E.D. Mo. May 29, 2015). This Court can find an abuse of discretion only where the evidence relied upon in rendering a claims determination is matched by overwhelming contrary evidence. *See, Whitler v. Standard Ins. Co.*, 815, F.3d. 1134, 1140 (8th Cir. 2016)(citing *Coker v. Metro Life Ins. Co.*, 281 F.3d 793,799 (8th Cir. 2002)). The foregoing arguments asserted by the Plaintiff based on cases from the Sixth circuit are therefore without merit. Even if the Court were to give weight to these arguments, Plaintiff's medical documentation is not overwhelmingly contrary to the conclusions drawn by Sedgwick.

Yet the Plaintiff further argues that the initial STD denial letter of July 31, 2015, was not based on the full documented medical proof submitted on behalf of the Plaintiff. (ECF No. 59 at 8). Sedgwick's initial denial of Plaintiff's STD benefits was based on the physical examinations of the Plaintiff by Dr. Sood, between May and July of 2015. Nurse Jansen stated that these examinations appeared normal and did not indicate a limited range of motion or decreased

---

evidence, *e.g.* ignoring objective medical tests and opinions of treating physicians for no reason, failing to rebut medical evidence, and not requesting an independent examination.

strength, swelling or spasm and because the Plaintiff did not receive any dosage increases on her medications; the MRI, EKG and CT scans provided, all of which were in normal ranges, unremarkable or did not show a change from prior imaging; a record from Dr. Patari, from June 10, 2015, which reflected that a recent CT scan showed no obvious impingement or recurrence of osteochondroma of Plaintiff's scapula. (AR AH0230). The Plaintiff asserts that Defendant failed to acknowledge the following evidence:

> Dr. Sood's April 15, 2015, observation that the Plaintiff has a history of chronic pain due to growing of back bone tremors on right shoulder and after surgery has found limitations in what she can do due to the return of pain from the regrowth of bone tremors.
>
> Dr. Sood's May 20, 2015, observation that the Plaintiff "uses strong opiate pain medications and muscle relaxants to control her pain and muscle tightness. The side effects impair her ability to do her work in a safe and effective manner. The over use of her shoulder and arms with repetitive movement can exacerbate her condition." (AR AH0213).
>
> Dr. Sood's June 3, 2015, observation that the Plaintiff's musculoskeletal review noted that she *was positive for joint pain or joint swelling and positive for muscle pain*. (AR AH0210)
>
> Dr. Sood's December 18, 2015, report stating that the Plaintiff stay off of work with short term disability due to her medical condition and side effects from the medication.
>
> Dr. Jiminez's January 5, 2016, diagnostic *x-ray showing that the Plaintiff has multiple osteochondromatosis*.[20] (AR AH0505-07).
>
> Dr. Drake's December 17, 2015, *X-ray of Plaintiff's left shoulder revealing moderate a.c. joint arthritis/osteochondroma and his impression of osteochodropathies in the left shoulder and left shoulder pain*.
>
> Dr. Bigol's January 22, 2016, letter stating that the Plaintiff will have great difficulty functioning with activities of daily living and will be unable to fulfill her professional duties; that her condition is likely permanent; and that the only viable treatment is pain control. (AR AH0494).
>
> Dr. Patari's June 10, 2015 record indicating that while there was no obvious impingement there *was crepitus in the superior border of the scapula with some atrophy of the surrounding fat musculature.* A corticosteroid was given between the scapula and ribs. (AR AH0167).

With regard to Dr. Sood's May 20, 2015, observations, the information referenced by the Plaintiff is found under Plaintiff's general complaint in her medical records. (AR AH0213). It is

---

[20] At this appointment, Dr. Jiminez also observed popping on range of motion but full range of motion. (AR AH0505-07).

not clear to the Court to what extent the statement is self-reported by the Plaintiff or an objective medical finding by Plaintiff's treating physician. Additionally, Dr. Sood's December 18, 2015, observations; Dr. Jiminez's January 5, 2016, diagnostic X-ray; Dr. Drake's December 17, 2015, X-ray and Dr. Bigol's January 22, 2015, letter were not submitted until after the initial claims decision was rendered on July 31, 2015. (AR AH0230). These documents were provided as supplemental material to Plaintiff's claim on appeal and therefore were not before the adjudicator at the time the initial denial of STD benefits was made. As stated previously, it is not for the Court to review information not available to the plan administrators at the time of their review. *See, King v. Hartford Life and Acc. Ins. Co.,* 414 F.3d 994, 999 (8th Cir. 2005).

Although Plaintiff submitted medical records documenting her numerous complaints to her medical providers and her diagnoses, the Defendants contest the Plaintiff's claim that she has submitted proof of functional limitations demonstrating that she is disabled. Defendant argues that diagnoses alone do not prove that Plaintiff had a disability. (ECF No. 61 at 11). Absent proof of impairments or restrictions, diagnoses simply do not equate to objective medical Proof of Disability." *Id.*, *and see, Pralutsky v. Metropolitan Life Ins. Co*., 435 F.3d 833, (In which a diagnosis of fibromyalgia could not be substituted for proof of the extent of the plan participant's disability).

Nurse Jansen and both of the physicians reviewing Plaintiff's claim file on appeal concluded that she was not so disabled as to require STD benefits. They did so after noting there was little or no objective evidence of impairment. Requiring objective medical proof of Plaintiff's disability is not unreasonable. *See Coker v. Metropolitan Life Ins. Co.*, 281 F.3d 793, 799 (8th Cir. 2002) (holding that providing only subjective medical opinions, which were

unsupported by objective medical evidence, did not suffice to prove a claim for benefits); *see also Prezioso v. Prudential Ins. Co. of America*, 748 F.3d 797, 806 (8th Cir. 2014) (same).

For the Court to find in favor of the Plaintiff, the Court must determine that it was unreasonable for the Claims Administrator to preference the reviews of independent medical examiners over Plaintiff's self-reported conditions and the opinions of her doctors. "When there is a conflict of opinion between a claimant's treating physicians and the plan administrator's reviewing physicians, the plan administrator has discretion to deny benefits unless the record does not support denial." *Johnson v. Metropolitan Life Ins. Co.*, 437 F.3d 809, 814 (8th Cir. 2006) (citation omitted). The opinions of treating physicians are not entitled to deference over the opinions of reviewing physicians. *See, Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)("courts have no warrant to require administrators to automatically accord special weight to the opinions of a claimant's physician; not many courts impose on plan administers a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."); *Weidner v. Fed. Express Corp.*, 492 F.3d 925, 930 (8th Cir. 2007)("a plan administrator does not abuse its discretion in denying claimant total disability benefits despite a treating physician's opinion that claimant was 'fully disabled.'"); *Dillard's Inc. v. Liberty Life Assurance Co. of Boston,* 456 F.3d 894, 899 (8th Cir. 2006)(rejecting contention that the plan administrator abused its discretion when in "credited a reviewer's analysis over a primary care physician's conclusions because the reviewer did not physically examine the claimant").

Upon review of the Administrative Record, no consensus arises between Plaintiff's treating physicians with regard to Plaintiff's functional capacity. While Dr. Sood is adamant that the Plaintiff cannot work and repetitive movements will exacerbate Plaintiff's condition, other

treating physicians provide a more complex picture of Plaintiff's ability. (AR AH0213). Dr. Anderson found the Plaintiff's strength to be symmetrical and determined that the Plaintiff had a full range of motion at the left shoulder. (AR AH0189). Dr. Patari found some atrophy surrounding the Plaintiff's musculature of her shoulder and some crepitus and recommended that the Plaintiff be treated with a corticosteroid and physical therapy (AR AH0167). Ms. Swierad, APN observed shoulder pain and popping but stated that her findings regarding the Plaintiff were otherwise normal. (AR AH0514-16). Dr. Bigol noted drowsiness from medication and that Plaintiff's shoulder and neck showed muscle fatigue and her upper extremities showed instability, but also noted that on her pain medication the Plaintiff had full range of motion. (AR AH0494, AH0504). Conversely, Dr. Drake observed no deformity, swelling, bruising or atrophy but noted that the Plaintiff had range of motion limitations. (AR AH0485-87). Confusingly he also stated that the Plaintiff had full range of motion with 160 degrees right abduction and 90 degrees of right external rotation. Finally, Dr. Jiminez noted that the Plaintiff had popping on range of motion but full range of motion. (AR AH0505-07).

In making a decision on Plaintiff's claim for STD benefits, Sedgwick states:

> The Unit reviewed medical records from Rajiv Sood, MD, Chintalben Shah, MD, Alexius Medical Center, Alexian Brother's Hospital Network, Jefferey Freihage, MD, Jordan Samuels, MD, Danielle Anderson, MD, Gregory Drake DO, Matthew Jiminez, MD, Percival Bigol, MD, and Jay Joshi, MD, dated March 21, 2012 through February 4, 2016.

> Ms. Presi's file was reviewed by independent specialist, Carol Hulett, MD, who is board certified in Orthopedic Surgery and Nakul Mahajan, MD, who is board certified in Pain Management. Dr. Hulett and Dr. Mahajan performed an independent review of all available medical documentation and outlined in detail the medical finding upon which the recommendation was made.

> Dr. Hulett completed peer contact with Rajiv Sood, MD, on April 19, 2016. Dr. Sood indicated that disability is due to recurrent

ostrochondromas/nerve pressure and headaches with high doses of pain management. No further information was provided.

Dr. Hulett made attempts to complete a peer to peer teleconference with Dr. Sanjay Patari, Dr. Gregory Drake, Dr. Percivol Bigol, and Dr. Matthew Jiminez on April 19, 2016. Messages were left for the physicians requesting a return call. No return call was received from either provider; therefore the teleconference was unsuccessful.

Dr. Mahajan made attempts to complete a peer to peer teleconference with Rajiv Sood, MD, Dr. Percival Bigol, and Dr. Jay Joshi, on April 19, 2016 and April 20, 2016. Messages were left for the physicians requesting a return call. No return call was received from either provider; therefore the teleconference was unsuccessful.

Based on the review of medical information, Ms. Presi was diagnosed with pain in the joint of the shoulder region, osteopenia, chondrodystrophy migraine with aura, benign neoplasm of the bone, and articular cartilafe, spasm of the muscle, and cervicalgia. Ms. Presi's treatment has consisted of physical therapy, injections, and medications. It is documented that Ms. Presi has had an osteochondroma surgically removed from the left scapula in 2012. However, her pain never resolved and she is being treated for chronic pain. Ms. Presi's range of motion and strength are normal and crepitation only. There has been no recurrence of the ostrochondroma. A functional capacity evaluation was suggested at one point in mid-2015 but never done.

From an Orthopedic Surgery perspective, Dr. Hulett opined that the clinical examination of the left shoulder does not demonstrate any positive clinical findings indicating functional limitation. Additionally there are not side effects from medication other than drowsiness, mentioned. This side effect would not result in an inability to safely perform in her own regular unrestricted job.

From a Pain Management perspective, Dr. Mahajan opined that the provided medical records do not include any clinical abnormalities to substantiate the need for work or activity restrictions. Examination findings by various physicians do not reveal any evidence of abnormalities consistent with an ongoing active process, such as malignant neoplasm. Also, there are no medication side-effects reported that would justify and substantiate the need for any work or activity restrictions. Additionally, there are no changes in mentation, muscle weakness or any other objective findings documented regarding taking the medication.

(AR AH0979-980).

While the Court's interpretation of the submitted medical evidence may not have been identical to that of the adjudicators for Sedgwick, it is not required for it to be the same. This Court "may not simply substitute its opinion for that of the plan administrator." *Fletcher-Merrit* 250 F.3d 1174, 1180 (8th Cir 2001). In this case, Sedgwick gave detailed reasons for denying Plaintiff's STD claim, clearly pointed to the basis for its decision, and declined to rely on Plaintiff's lack of objective support for her claimed disability. Upon consideration of the record before it, the Court cannot say that Sedgwick abused its discretion in denying the Plaintiff's claim for STD benefits and the denial of benefits based upon lack of objective evidence of the Plaintiff's disability is not unreasonable.

II.     **Plaintiff's claim for LTD benefits**.

In her Motion for Summary Judgement Plaintiff contends that her LTD claim should have been approved by Sedgwick. The Defendant argues that the Plaintiff is not entitled to LTD benefits because Plaintiff failed to satisfy a condition precedent to receive them. *Id.* at 2. Plaintiff contends that Defendant's proffered reason for denying her LTD benefits is deceptive because the Plaintiff had already filed a lawsuit regarding her denial of STD benefits when the Defendant concluded that the denial of STD benefits precluded her from being eligible for LTD benefits. (ECF No. 63, 9-11). Plaintiff further asserts that the documentation that was provided along with her claim for LTD benefits was sufficient to present a valid claim for LTD benefits. *Id.*, 9-13. Defendant argues that the Plaintiff has not offered any evidence to support her claim that the Plaintiff's lawsuit for STD benefits had any impact on the administrative decision making process for Plaintiff's claim for LTD benefits. *Id.* at 12. The Court agrees. The LTD Plan explains that the completion of a 180-day elimination period is necessary for the Plaintiff to seek

LTD benefits. Plaintiff does not argue that she has completed the elimination period. Plaintiff only argues that the documentation submitted ought to demonstrate that she is disabled. Since the completion of the elimination period is necessary for the Plaintiff to seek LTD benefits, the Court will uphold the Defendant's denial of LTD benefits for the Plaintiff's failure to satisfy a condition precedent.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgement (ECF No. 55) is **GRANTED**, and Plaintiff's Motion for Judgement on the Administrative Record or in the Alternative Motion for Summary Judgement (ECF No. 58) is **DENIED**. An appropriate Judgement will accompany this Memorandum and Order.

Dated this 14th day of March 2019.

/s/ Jean C. Hamilton
UNITED STATES DISCTIRT JUDGE